UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

|                                      | :  |                  |
|--------------------------------------|----|------------------|
| RICO DIAMOND,                        | :  |                  |
|      Plaintiff,                      | :  |                  |
|                                      | :  |                  |
| v.                                   | :  | No. 2:05-cv-279   |
|                                      | :  |                  |
| JACK O'CONNOR; UNNAMED OFFICERS      | :  |                  |
| OF THE SOUTH BURLINGTON POLICE       | :  |                  |
| DEPARTMENT; AND CITY OF SOUTH        | :  |                  |
| BURLINGTON,                          | :  |                  |
|      Defendants.                     | :  |                  |
|                                      | :  |                  |
|                                      | :  |                  |

UNDERLINE OPINION AND ORDER

The Plaintiff commenced the instant action on October 17, 2005, against Defendants O'Connor and the City of South Burlington ("City") under 42 U.S.C. § 1983 based on alleged violations of his Fourth and Fourteenth Amendment rights.  A jury trial commenced on July 22, 2008.  At the close of evidence, Plaintiff filed a motion seeking that the Court enter judgment on the specific issue of O'Connor's alleged Fourth Amendment violation pursuant to Fed. R. Civ. P. 50(a)(1).  For the reasons set forth below, the Court hereby grants Plaintiff's motion.

## BACKGROUND

The following represents a summary of the facts relevant to the issue of whether the Defendant seized the Plaintiff's money in violation of the Fourth Amendment.  The Court finds that the relevant facts are largely undisputed.  However, to the extent

that factual disputes exist, the Court has considered the evidence in the light most favorable to Defendant O'Connor because the Plaintiff has brought this motion for judgment as a matter of law under Fed. R. Civ. P. 50. *See Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir. 1988). Thus, the Court has reviewed "all of the evidence in the record," but has "disregarded all evidence favorable to the moving party that the jury is not required to believe." *Tolbert v. Queens Coll.,* 242 F.3d 58, 70 (2d Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Plaintiff Rico Diamond is an African-American pastor living in Vermont; his given name is Ricardo Herb. Jack O'Connor is a police officer employed by the South Burlington Police Department ("SBPD"). On the evening of March 21, 2005, O'Connor telephoned a number of area hotels, including the Holiday Inn Express in South Burlington, to ask managers if they had observed any customers exhibiting suspicious behavior or displaying large amounts of cash. Shortly after O'Connor's call, Diamond entered the Holiday Inn with a friend, Ivy Biggs. Diamond rented a room which he paid for in cash. Although he had checked in as Rico Diamond, he showed the hotel staff a Vermont state identification card which contained his given name, Ricardo Herb. The hotel

staff telephoned O'Connor and notified him of these facts.[1]

One of O'Connor's fellow officers, Detective Chaulk, ran a criminal background check and discovered that Diamond was fifty-three years old, was born in New York City, and had a criminal record.  Diamond was convicted of third degree robbery in 1970 and 1973.  His only other conviction and only other recorded interaction with law enforcement in the intervening three decades was for unlicensed operation of a vehicle in 1995.  O'Connor then proceeded to the hotel accompanied by Detective Chaulk and Officers Snyder and Brunelle.  Before going to the hotel, O'Connor did not have any information about Diamond.

O'Connor and Brunelle approached the hotel room while Chaulk and Snyder remained between fifteen and thirty feet away, down the hallway.  O'Connor knocked a number of times and at some point while at the door identified himself as a police officer. The officers remember a delay lasting between two and five minutes before Diamond opened the door.  During this time, O'Connor testified that Diamond said there was a woman in the room and that he was getting dressed.

---

[1] The record includes conflicting testimony about what else was said and whether there was one telephone call or more.  The evidence is undisputed that O'Connor asked Lopez, the hotel clerk, about Diamond's race and learned that he was "dark-skinned."  O'Connor contends that this conversation only occurred after the decision to go to the hotel had already been made.  The Court notes that although the disputed factual issues may be relevant to Diamond's claim of a Fourteenth Amendment violation, they do not bear on the issue considered here.

3

After Diamond opened the door, O'Connor asked for permission to enter and Diamond consented.  Diamond's demeanor was relaxed and considerate throughout the interaction and he voluntarily cooperated with O'Connor.[2]  Diamond introduced himself and gave O'Connor both his given name, Ricardo Herb, as well as the name he used, Rico Diamond.  Diamond informed O'Connor that he lived in Burlington, that he had a job working at McDonald's, that he was also a pastor in a Vermont ministry, and that he had a branch of his ministry in New York.  Diamond told O'Connor that he had come to the hotel that evening to inquire about renting a block of rooms for his Easter seminar, scheduled for the upcoming weekend.  He also notified O'Connor that there was a woman taking a jacuzzi bath in the bathroom.  O'Connor heard water running from the bathroom.

At some point O'Connor requested permission to search the room.  Diamond consented and also agreed to allow the other officers to enter and assist with the search.  The three officers conducted a thorough search while O'Connor and Diamond continued

---

[2]  O'Connor has testified that he was courteous and respectful throughout the encounter as well.  However, there is undisputed testimony that O'Connor made disparaging remarks about Diamond and Biggs in and out of their presence.  O'Connor has testified that, after learning of Diamond's race and build, he remarked to Lopez, the hotel clerk, that Diamond's build was probably a result of eating "prison food."  In addition, while speaking with Doud in the hotel room in the presence of Diamond and Biggs, O'Connor referred to Biggs by using a vulgar epithet for a prostitute.

4

speaking.   The search revealed no contraband in the room nor any
evidence associated with the use or distribution of illegal
drugs.

During their conversation, Diamond notified O'Connor that he
had a substantial amount of cash with him and that it was located
in his jacket pocket.   Diamond had five thousand two hundred
dollars in currency.   He explained to O'Connor that he intended
to use the money to make arrangements for the Easter conference
that his ministry was organizing.   Diamond explained that the
currency had been mailed to him by one of his ministers from New
York, Tonya Clark.   Diamond mentioned that he intended to reserve
a block of rooms at the hotel and that he had previously made
arrangements for reserving rooms with two employees, one of whom
was named Kidada McCullough.   (O'Connor knew Kidada McCullough to
be the mother of Ibrahim McCullough, whom he suspected of
involvement in illegal drugs.)   When asked about the exact amount
of currency he was carrying, Diamond made a number of statements
which O'Connor interpreted to be contradictory.

O'Connor expressed skepticism about Diamond's claims.
Diamond, therefore, provided O'Connor with Tonya Clark's phone
number so that he could confirm that she was the source of the
money.   Although both Diamond and Clark denied hearing it,
O'Connor testified that he identified himself as a police officer
when he called Clark.   There is no dispute that Clark told

O'Connor that she had mailed two thousand dollars to Diamond at
his Burlington address and that she denied any intention of
coming to Vermont.  Clark testified that she was confused and
suspicious when she received the call and therefore not
completely candid with O'Connor.

O'Connor telephoned Tom Doud, Special Agent for the United
States Drug Enforcement Agency ("DEA") to inquire about
initiating a federal forfeiture proceeding.  O'Connor told Doud
that he was at the Holiday Inn Express on a tip from the hotel,
that he was with a man with ties to New York, that the man had
two names and used one in Vermont and the other in New York, that
he had a criminal history, that he was with a woman who had
involvement with police, that he had delayed in opening the door,
that he had understated the amount of money he had, and that the
money was allegedly from a source in New York, but that the
source only confirmed a portion of the money.  O'Connor also told
Doud that their search of the room had not revealed any illegal
drugs.

Doud testified that O'Connor told him Diamond was a black
male and that he believed, based on O'Connor's statements, that
Diamond lived in New York.  He was not told that Diamond had a
Vermont residence, that he had lived in Vermont for ten years,
nor that Diamond's two felony convictions were more than thirty
years old.  Doud testified that he had never heard of Diamond or

Biggs prior to March 21, 2005.  Doud also testified that, based on the facts relayed to him, he told O'Connor that he believed O'Connor could seize the money and conduct further investigations, and that the DEA would consider forfeiture if there was a drug nexus.

While O'Connor was on the phone with Doud, Diamond called Clark and spoke with her.  O'Connor testified that he heard Diamond tell Clark to "tell them more."  O'Connor testified that he did not speak with Clark again after that.

At some point after the initial search but before his call to Doud, O'Connor knocked on the bathroom door and asked Ivy Biggs to come out.  When Biggs emerged from the bathroom, she was visibly angry that the police were in the room, and made a number of comments and hand gestures demonstrating her upset before Diamond calmed her down.  O'Connor called in a criminal background check on Biggs and learned that she had a number of convictions, though none for drug offenses.  O'Connor later called Detective Merchand of the Burlington Police Department. Merchand stated that he had information from a confidential informant had Ivy Biggs was involved in illegal drugs.  In all of his previous reports and his deposition testimony, O'Connor had consistently indicated that this call happened later that night or within a few days after the seizure.  However, at trial, O'Connor testified that he now remembered making the call after

7

speaking with Doud but before leaving the hotel.

After spending close to an hour in the room, O'Connor decided to seize the currency and bring it back to the SBPD. At Diamond's request, O'Connor gave Diamond a copy of his business card as a receipt, noting on it the amount of cash seized. He also provided a phone number and told Diamond that he could call the DEA at that number to inquire about recovering his money. Diamond called the number the following day; however, he was told that the DEA did not have any information on the seizure.

Diamond's money remained at the SBPD for the next three days. The SBPD has issued formal procedural guidelines on initiating "DEA Adoption Forfeitures" after police officers have seized assets. The SBPD policy instructs officers to submit an "adoptive forfeiture package" which includes all police reports and, in cases where currency has been seized, a bank check in the amount seized. On March 24, 2005, Detective Chaulk converted the money into a bank check and delivered the check to the DEA. At some point after March 31, 2005, O'Connor completed an incident report which he forwarded to the DEA.

Between March 21, 2005, and the completion of his incident report, O'Connor completed little further investigation. O'Connor did not conduct further investigation of Diamond, the source of the money, or whether Diamond had any connection to illegal drugs. He did not arrange for a canine drug inspection

8

of the hotel room or the seized currency, did not investigate phone records, did not visit Diamond's home or contact informants for information about Diamond.  O'Connor has testified that he may have called area hotels to confirm whether Diamond had booked rooms for his seminar and that he may also have contacted the florist Diamond indicated using for the seminar.  O'Connor also testified that he learned during this time that two young men, Marcus and William Morales, had operated a vehicle which was co-owned by their aunt, Laurinda Pilgrim, and by Diamond.  (O'Connor believed both Marcus and William Morales were involved in illegal drugs.)

## DISCUSSION

### I.  Constitutionality of the Seizure as a Mixed Question of Fact and Law

The instant motion comes before the Court pursuant to Rule 50.  Plaintiff, in his Rule 50 motion, has argued that there is insufficient evidence on the record for a reasonable jury to conclude that O'Connor did not effect an illegal seizure of Diamond's currency.  The Court has set forth below the appropriate legal standard for a Rule 50 motion and has, for the purposes of its analysis, considered the evidence accordingly.

Nonetheless, the Court notes that the Plaintiff has advanced an alternate argument in his proposed jury instructions which essentially compels the same outcome.  In his proposed jury

instructions, Plaintiff observes that the existence of reasonable suspicion or probable cause are mixed questions of fact and law. *See Ornelas v. United States*, 517 U.S. 690, 696-97 (1996). Although these issues may be submitted to the jury, *Simms v. Village of Albion*, 115 F.3d 1098, 1110 (2d Cir. 1997) ("A mixed question of fact and law may be submitted to the jury only if the jury is instructed as to the applicable legal standards."), Plaintiff contends that the record in this case is devoid of material factual disputes relevant to the constitutionality of the seizure.  As such, Plaintiff argues that the Court should decide the question as a matter of law.

After reviewing the record, the Court is persuaded that the relevant material facts are largely undisputed.  The Second Circuit has taught that the determination of reasonable suspicion or probable cause involves two steps: (1) the identification of facts establishing suspicion and (2) the application of an "objective legal standard to the facts."  *United States v. Singh*, 415 F.3d 288, 293 (2d Cir. 2005).  Because there is no significant dispute between the parties as to the first step of the analysis, the Court need only engage in the application of an objective legal standard.  "It has long been recognized that, where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court."  *Walczyk v. Rio*, 496 F.3d 139,

157 (2d Cir. 2007) (collecting cases).  Therefore, even if the
Court were not to grant the Plaintiff's Rule 50 motion, it would
be appropriate for the Court to reach the same conclusion as a
matter of law.

**II. Rule 50 Motion**

*A.  Legal Standard*

A motion for judgment as a matter of law pursuant to Rule 50
may be granted when "a reasonable jury would not have a legally
sufficient evidentiary basis to find for [the non-moving] party
on that issue."  Fed. R. Civ. P. 50(a)(1).  The standard under
Rule 50 "mirrors" that for a motion for summary judgment under
Rule 56.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51
(1986).  On a Rule 50 motion, a court must consider all evidence
in the record and not simply the evidence favorable to the
nonmovant.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.
133, 150 (2000); *Tolbert*, 242 F.3d at 70.  "In doing so, however,
the court must draw all reasonable inferences in favor of the
nonmoving party, and it may not make credibility determinations
or weigh the evidence." *Reeves*, 530 U.S. at 150 (citations
omitted). Thus, in reviewing the entire record, a court should
consider only that evidence favorable to the nonmoving party and
any evidence supporting the moving party which is uncontradicted
and unimpeached.  *Id*. at 151.

*B.  Illegal Seizure*

11

1. *Factual Predicate*

O'Connor has argued that a number of factors support the constitutionality of his actions.   In particular he has called attention to the following facts which he claims were known to him at the time of the seizure: the discovery of a substantial sum of cash; Diamond's use of two names, Diamond's ties to New York City; Diamond's two felony convictions dating from 1970 and 1973 and his conviction for driving without a license in 1995; the delay in answering the door; perceived inconsistencies in Diamond's statements about the amount of money; that Diamond was acquainted with Kidada McCullough, a woman whose son O'Connor suspected of involvement in illegal drugs; inconsistencies between Diamond's statements and Tonya Clark's statements; information about Ivy Biggs regarding involvement in illegal drugs.

The record, however, also includes a number of undisputed facts which argue persuasively against any suspicion that the money was furnished or intended to be furnished in connection with an illegal drug transaction.  Not least among these is the fact that the officers discovered no evidence of any drug activity, be it actual narcotics, drug paraphernalia, or other evidence of drug use, packaging, or sale.  Among the many additional factors tending to dispel suspicion, the Court notes that there was absolutely no evidence connecting Diamond to

illegal drug activity; in particular, he had no drug convictions
and O'Connor had received no information from any source that
Diamond was involved in illegal drugs.  The Court also notes that
Diamond was by all accounts calm and cooperative throughout the
incident.

In the days and weeks following the initial seizure of
Diamond's money, O'Connor conducted little further investigation.
Indeed, assuming that O'Connor is correct that he called Merchand
while still at the hotel, there is no evidence on the record that
O'Connor took any steps to investigate a suspected drug nexus for
at least three days to one week after the seizure.  O'Connor
testified that his investigation consisted almost solely of
checking Diamond's motor vehicle records sometime around March
28, 2005.  Based on this record check O'Connor confirmed that
Diamond had jointly owned a vehicle with Laurinda Pilgrim and
that the vehicle had been operated by Pilgrim's two nephews,
William and Marcus Morales, both of whom O'Connor believed to be
involved in illegal drugs.  There was no other investigation
supporting any suspicion that Diamond's money was substantially
connected to illegal drug activity.

2.  *Determination of Probable Cause*

O'Connor has argued that his actions were not violative of
the Fourth Amendment.  In the first instance, he asserts that
probable cause existed at the time of the seizure to believe that

the seized money was furnished or intended to be furnished in an
illegal drug transaction.  After consideration of all of the
factors known to O'Connor at the time of the seizure in their
totality, the Court finds that probable cause clearly was not
established.  Probable cause refers to "reasonable grounds to
believe that 'a substantial connection exists between the money
to be forfeited and the exchange of a controlled substance.'
Such grounds must rise above the level of mere suspicion, but
need not amount to a preponderance of the evidence." *United
States v. $31,990 in U.S. Currency*, 982 F.2d 851, 854 (2d Cir.
1993) (quoting *United States v. U.S. Currency in the Amount of
$ 228,536.00*, 895 F.2d 908, 916 (2d Cir.), *cert. denied*, 495 U.S.
958 (1990).  "[C]ircumstantial evidence and inferences therefrom
can suffice to support a finding of probable cause." *United
States v. $175,260 in U.S. Currency*, 741 F. Supp. 45, 46-48
(E.D.N.Y. 1990) (citing *United States v. $31,828 in U.S.
Currency*, 760 F.2d 228 (8th Cir. 1985)).

O'Connor has correctly pointed out that many of the factors
present in this case are relevant to determining probable cause.
O'Connor has also noted numerous decisions in this and other
circuits in which probable cause was found and one or another of
these factors were present.  Nevertheless, probable cause is not
"readily, nor even usefully, reduced to a neat set of legal
rules," *Illinois v. Gates*, 462 U.S. 213, 232 (1983); rather, in

determining probable cause, context is key.  Viewing the facts in the aggregate, as the Court must, *see Walczyk*, 496 F.3d at 156-57, the Court finds that the factors supporting suspicion in this case are readily distinguishable from the cases upon which O'Connor relies.

For example, O'Connor relies heavily on the presence of a substantial amount of currency, arguing based on a Ninth Circuit decision, that "[c]arrying a large sum of cash is 'strong evidence' of this [drug-money] relationship even without the presence of drugs or drug paraphernalia." *United States v. $215,300 in U.S. Currency*, 882 F.2d 417, 419 (9th Cir. 1989). However, in that case, the panel also considered, inter alia, the significantly larger sum at issue (over $200,000), the fact that the claimant concealed most of the money by strapping it to his body, and that there was a positive canine alert to the currency. *Id; see also $175,260*, 741 F. Supp. at 46-48 ("strong positive" canine alert "alone is sufficient to establish probable cause").

O'Connor also quotes the Second Circuit's observation that $2,500 is substantially more money "than is commonly kept in residential premises by law-abiding wage earners." *United States v. $2,500 in U.S. Currency,* 689 F.2d 10, 16 (2d Cir. 1982). However, O'Connor fails to note that in that case, police not only recovered evidence of drugs and drug paraphernalia but also had evidence of a recent DEA purchase of $16,000 of heroine from

15

the claimant.  *Id.* at 16.  Indeed, the Second Circuit has elsewhere held that "the possession of large amounts of cash is [not] per se evidence of drug-related illegal activity."  *$31,990 in U.S. Currency*, 982 F.2d at 854; *see also United States v. One Lot of Currency Totaling $14,665*, 33 F. Supp. 2d 47, 53 (D. Mass. 1998) (observing that "money in and of itself is inadequate to establish probable cause" and that "the whole notion that carrying cash is indicative of illegal conduct reflects class and cultural biases that are profoundly troubling").

Similarly, O'Connor has noted Diamond's connection with a "source city."  Although Diamond had lived in and visited New York City, he was not at the time of the seizure traveling to or from New York.  Yet the cases cited by O'Connor on this point both involved airport detentions.  *See United States v. $67,220 in U.S. Currency*, 957 F.2d 280, 285 (6th Cir. 1992); *United States v. $42,500 in U.S. Currency*, 283 F.3d 977, 981 (9th Cir. 2002).  Similarly, although Diamond had used two names, he did not attempt to hide his true identity or mislead the officers. *Compare $175,260 in U.S. Currency*, 741 F. Supp. at 46.

In Diamond's case, not only were no drugs recovered, there was no positive canine alert, and Diamond was not involved in imminent air travel.  Although there were real and perceived inconsistencies in Diamond's statements to O'Connor, the inconsistencies, while raising suspicion, were not "probative

evidence of drug trafficking." *$31,990 in U.S. Currency*, 982 F.2d at 855.  Indeed, the absence of evidence of any direct involvement by Diamond in illegal drug activity may well have been sufficient, in and of itself, to dispel these suspicions.

The Court acknowledges that O'Connor has extensive experience in the interdiction of illegal drugs.  As such, the Court notes that O'Connor may have been particularly attuned to certain indicators of illegal drug activity.  However, this does not mean that any conduct which differed from the norm, as O'Connor understood it, was necessarily indicative of illegal drug activity.  *See id.* (distinguishing between "consciousness of guilt generally" and a specific "inference of drug trafficking").  The fact that Diamond's reasons for having the money were unusual is not probative evidence of illegal drug activity.

The Court concludes that there was little evidence at the time of the seizure to support the conclusion that the money was tied to criminal drug activity, and a substantial amount of evidence to suggest that Diamond was lawfully in possession of it.

3.  *Determination of Reasonable Suspicion*

At most, the facts known to O'Connor may have warranted reasonable suspicion at the time of the initial seizure.  Indeed, O'Connor has alternatively suggested that the seizure was lawful on the basis of reasonable suspicion.  The case law, however, is clear that only a "brief" and "limited" investigative detention

of property may be supported by reasonable suspicion alone.
*United States v. Place*, 462 U.S. 696, 706 (1983).  The Supreme
Court has articulated a number of factors "in determining whether
the seizure is so minimally intrusive as to be justified on
reasonable suspicion," chief among them being "the brevity of the
invasion."  *Id.* at 709.  In addition to the length of the
detention, courts look to whether the police diligently pursued
their investigation and the degree to which police informed the
Plaintiff of what
arrangements would be made for return of his property in the
event that suspicion was dispelled.  *Id*. at 709-10.

      At the very least, the seized money continued to be held by
the SBPD for nearly three full days, until it was converted into
a bank check and delivered to the DEA on March 24, 2005.  (In
fact, O'Connor did not provide his report to the DEA until at
least a full week later, and the money was not returned to
Diamond for more than three weeks.)  Even a three-day seizure in
this case far exceeded the scope of a brief investigative
detention.  *See id.* (holding 90-minute detention to be
unreasonably intrusive); *see also United States v. $557,933.89*,
287 F.3d 66, 88 (2d Cir. 2002) (holding that overnight detention
"cannot be justified as a brief investigatory detention
supportable by less than probable cause").  The unreasonableness
of the detention is further highlighted by the minimal

investigation conducted during the detention.[3]  The Court
acknowledges that the amount of currency, the existence of two
names, and the inconsistencies, real and perceived, between
Diamond's statements and those made by Clark, in the context of
all the other factors, were sufficient to raise suspicion,
particularly when viewed by officers with expertise in drug
interdiction.  However, these suspicions might have been
dispelled or confirmed by further investigative efforts.
O'Connor largely failed to make such efforts.  At no time during
O'Connor's investigation did the evidence ripen into probable
cause.

    *4.  DEA Participation*

    O'Connor has also argued that he should not be held
responsible because he was acting at the behest of Agent Doud and
the DEA.  This argument fails on a number of grounds.

    In the first instance, the Court notes that O'Connor seeks
to rely on the decision issued only a few days ago by the Tenth
Circuit in *United States v. Chavez*, No. 07-2008, 2008 WL 2893057
(10th Cir. July 29, 2008).  O'Connor's reliance is misplaced, not
least because *Chavez* involved drastically different facts.  In
*Chavez*, a DEA agent, after developing more than sufficient
information to establish the probable cause necessary to effect a

---

[3]  The Court also notes that O'Connor essentially made it
impossible for Diamond to recover the money before the seminar
despite Diamond's efforts at producing relevant documentation.

constitutional stop, asked a local law enforcement officer to
execute the stop.  *Id.* at *7.  The panel held that probable cause
was established *prior* to the stop —— a stop that was initiated by
the local law enforcement officer based on the theory that,
because the DEA agent was aware of the totality of the evidence,
this knowledge could be imputed to him from the DEA.  *Id.*  In
this case there is no dispute that the "knock and talk" was
initiated by O'Connor solely on the basis of information known to
him.  As a result, the "vertical" collective knowledge doctrine,
as that panel termed it, *id.* at 5, has no application to the
facts of this case.

        Nor does the record in this case support the application of
the traditional ("horizontal") collective knowledge doctrine.
Horizontal collective knowledge exists when several different law
enforcement officers have information relevant to probable cause,
but no one officer possesses all the information needed for
probable cause.  *Id.*  "In such situations, the court must
consider whether the individual officers have communicated the
information they possess individually, thereby pooling their
collective knowledge to meet the probable cause threshold."  *Id.*;
*accord United States v. Ramirez,* 473 F.3d 1026, 1037 (9th Cir.
2007); *United States v. Williams,* 429 F.3d 767, 771-72 (8th Cir.
2005); *United States v. Burton,* 288 F.3d 91, 99 (3d Cir. 2002);
*United States v. Ibarra-Sanchez,* 199 F.3d 753, 758-59 (5th Cir.

1999); *United States v. Celio,* 945 F.2d 180, 183-84 (7th Cir. 1991).

Neither Doud nor O'Connor's testimony suggests that Doud shared additional facts with O'Connor that elevated O'Connor's evaluation of whether probable cause existed.[4]  To the contrary, Doud testified that he had no knowledge of any additional relevant facts.  He specifically stated that he had never heard of Diamond prior to March 21, 2005.  In sum, the mere fact that O'Connor contacted the DEA while at the scene does not absolve him of his responsibility to determine that probable cause existed prior to effecting the seizure.

Furthermore, despite O'Connor's claims to the contrary, there is a legal distinction between a seizure and a forfeiture action, and the distinction is more than semantic.  A seizure refers to the "act . . . of taking possession of a person or property", whereas a civil forfeiture is an "in rem proceeding brought by the government against property that either facilitated a crime or was acquired as a result of criminal activity."  *Black's Law Dictionary* 661, 1363 (7th ed. 1999).

The distinction is implicit in the SBPD's own policy statement on "DEA Adoption Forfeitures."  In cases of currency seizures, the policy clearly assumes that local law enforcement

---

[4] The Court notes that the other officers on the scene testified that they had no additional relevant information that was not already known to O'Connor, and that they believed O'Connor had more information regarding the incident than anyone else.

21

has already effected the seizure before seeking to submit the package to the DEA to initiate a potential forfeiture proceeding. Doud's testimony confirmed this distinction: he stated that the customary practice was for local law enforcement to contact him about adoptive forfeitures *after* they had effected a seizure. The DEA clearly did not commence a forfeiture action in this case on the evening of March 21, 2005.  Instead, on that evening, O'Connor effected a seizure, and his seizure was subject to all of the requirements of the Fourth Amendment.

From a policy perspective, a contrary holding would pose significant perils.  Such a holding would create a state of limbo more precarious than that envisioned by St. Augustine, a realm in which neither federal nor state officials could be held accountable for actions that clearly violated the constitutional rights of the citizenry.  It would encourage local law enforcement officers to insulate themselves from responsibility for their actions by merely consulting with federal authorities during the course of an investigation.

C.  *Qualified Immunity*

"The doctrine of qualified or good faith immunity shields police officers from being subject to personal liability for damages." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 127 (2d Cir. 1997).  A police officer is entitled to qualified immunity from claims brought under federal law if either (1) his conduct does not violate clearly established rights of which a

22

reasonable person would have known, or (2) it was objectively
reasonable at the time for him to believe that his actions were
lawful.  *See Cerrone v. Brown*, 246 F.3d 194, 199-200 (2d Cir.
2001).

"The availability of the defense depends on whether a
reasonable officer could have believed his action to be lawful,
in light of clearly established law and the information [he]
possessed."  *Marshall v. Sullivan*, 105 F.3d 47, 53 (2d Cir. 1996)
(quotation marks and emphasis omitted) (alteration in original).
Moreover, qualified immunity is appropriate when the only
conclusion a rational jury could reach is that under the
circumstances reasonably competent police officers could disagree
about the legality of the defendant officer's conduct.  *See
Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995).

The Fourth Amendment right to be free of unlawful searches
and seizures was clearly established at the time of the incident
in question.  Therefore, qualified immunity would only be
appropriate in this case if it was objectively reasonable at the
time of the seizure for O'Connor to believe that his actions were
lawful.  The Court finds that no reasonably competent officer
could conclude that O'Connor's seizure and continued detention of
Diamond's money came within the bounds of the Fourth Amendment's
requirements.  As the Court has already detailed above, the
specific articulable facts, when considered in their totality,
were insufficient to lead a reasonable law enforcement officer to

suspect that the seized money was tied to illegal drug activity. Moreover, O'Connor's continued detention of the money in the wake of his failure to investigate was clear constitutional error.

*D. Nominal and Punitive Damages*

Diamond has disavowed any claim to compensatory damages on the basis of his § 1983 claim.  Therefore, the Court awards nominal damages in the amount of one dollar.  In addition, the Court awards reasonable attorney's fees to the Plaintiff.

Diamond also seeks punitive damages. A plaintiff may recover punitive damages in a section 1983 case if "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Mathie v. Fries*, 121 F.3d 808, 815 (2d Cir. 1997).  The Court finds that O'Connor's conduct was not motivated by evil motive or intent, nor did it show reckless or callous indifference to the constitutional rights violated.  Therefore, the Court does not award any punitive damages for that portion of Diamond's Section 1983 claim based on a deprivation of his Fourth Amendment rights.

## CONCLUSION

For the reasons set forth above, the Court hereby GRANTS Plaintiff Diamond's Rule 50 motion with respect to the Plaintiff's Fourth Amendment claim under § 1983.

The Court ENTERS JUDGMENT for the Plaintiff on this claim against Defendant O'Connor and AWARDS nominal damages in the amount of ONE DOLLAR and all reasonable attorneys' fees.

Dated at Burlington, Vermont this 7th day of August, 2008.


/S/ William K. Sessions III
        William K. Sessions III
        Chief Judge